IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GERARDO GARCIA, | ) |
| *Petitioner*, | ) |
| | ) Case No. 16 C 8829 |
| v. | ) |
| | ) Judge Virginia M. Kendall |
| JOHN VARGA, | ) |
| Warden, Dixon Correctional Center.* | ) |
| *Respondent*. | ) |

## MEMORANDUM OPINION AND ORDER

Gerardo Garcia, a state prisoner, petitions pro se for a writ of habeas corpus under 28 U.S.C. § 2254. (Dkt. 1.) He asks this Court to grant the petition and order a new trial on three constitutional grounds: (1) an Illinois trial court denied him due process of law when it found, after a retrospective fitness hearing, that he was competent to stand trial for murder and plead guilty to a firearm offense; (2) his trial counsel did not effectively assist him when they stipulated to the State's insufficient factual basis underlying the firearm offense; and (3) his trial counsel did not effectively assist him by failing to adequately investigate the extent of his mental difficulties and by misinforming the court that his medication was not psychotropic, even though it was. (Dkt. 1.) Because Garcia procedurally defaulted the third argument,

---

* Because the petitioner is currently in custody under a state-court judgment, his current custodian—Warden John Varga—automatically substitutes in as the respondent. *See* Rule 2(a) of the Rules Governing Section 2254 cases in the United States District Courts; Fed. R. Civ. P. 25(d); *Bridges v. Chambers*, 425 F.3d 1048, 1049–50 (7th Cir. 2005).

and the other two do not overcome the highly deferential standards that govern habeas review, the Court denies his petition.

## BACKGROUND

In 1998, the State of Illinois charged Garcia with two counts of Unlawful Use (or possession) of a Weapon by a Felon ("UUWF") and two counts of Unlawful Use of a Weapon ("UUW"). *See People v. Garcia*, 2015 IL App (1st) 131180, ¶ 6. With those charges still pending, Garcia shot two people, killing one. *Id.* Accordingly, the State charged him in a new case with first-degree murder, attempted first-degree murder, and aggravated battery. *Id.*

### I. Facts

On December 5, 2000, while in custody awaiting his murder trial, Cermak Hospital admitted Garcia, placing him in full leather restraints for four hours after he threatened to commit suicide by hanging himself or cutting his wrists. *Id.* at ¶ 8. Garcia explained that he wanted to kill himself because his case was going poorly and he feared the significant consequences of the court finding him guilty. *Id.* He also felt stressed because of worry for his family and ex-girlfriend. *Id.* The physicians prescribed several medications to treat anxiety and depression including Zoloft, Trazodone, and Lorazepam (which can act as a sedative). *Id.* The hospital discharged Garcia the following day; however, he remained on psychotropic medication while in jail. *Id.* Garcia returned to the hospital on April 2, 2001, following an attempted suicide. *Id.* at ¶ 9. Garcia tried to kill himself by cutting his ankles and overdosing

on medication. *Id.* In May, doctors prescribed him an additional antidepressant with a sedative function, Doxepin. *Id.*

At his bench trial on June 29, 2001, Garcia did not testify, and when questioned by the court regarding that decision, Garcia answered: "No, I don't want to testify." *Id.* at ¶ 10. Following trial, the judge convicted Garcia of first degree murder and aggravated battery with a firearm. *Id.* The next month, on July 19, the hospital admitted Garcia again. *Id.* at ¶ 11. At that time, a psychiatrist considered his risk of attempting suicide to be high because he previously planned ways to kill himself. *Id.* Garcia exhibited depression and mental confusion that night, and the next day, a psychologist observed that Garcia displayed "limited insight, judgment & impulse control." *Id.* The hospital discharged Garcia two days later. *Id.*

On August 19, correctional authorities brought Garcia back to the hospital for a fourth time, showing signs of depression, mental confusion, and psychosis, including auditory hallucinations and paranoid ideation. *Id.* at ¶ 12. Garcia said that he was fine until he stopped taking his medication because of stomach pain. *Id.* He resumed his treatment and the hospital discharged him the next day. *Id.* A few weeks later, on September 11 (the night before his sentencing), correctional staff took Garcia to the emergency room and hospital personnel placed him in restraints "for the protection of self and others" after fighting with another inmate. *Id.* at ¶ 13. The hospital sedated and restrained him overnight for 16 hours. *Id.*

At sentencing on September 12, defense counsel informed the court of one of Garcia's suicide attempts and the medical treatment he was receiving. *Id.* at ¶ 16.

The judge asked counsel whether the medication was psychotropic, and counsel responded that it was not. *See People v. Garcia*, 2015 IL App (1st) 131180, ¶ 16. The court replied, explaining that he "certainly could see nothing but that Mr. Garcia is anything other than competent. He certainly has conducted himself in an appropriate manner through these proceedings." *Id*. Counsel agreed. *Id*. For his part, Garcia allocuted and apologized. *Id*. The court sentenced Garcia to 28 years in prison for the murder and a concurrent six for the battery. *Id*. at ¶ 17.

That same day, in the same court, Garcia pled guilty to one count of UUWF for possessing a firearm on or about his person. *Id*. at ¶¶ 18–19. During the hearing, the State set out its factual basis, contending that Garcia admitted to law enforcement that his car was at the location of the arrest and that there was a gun inside of it. *Id*. at ¶ 19. Police officers recovered a .25-caliber semiautomatic blue steel pistol loaded with four live rounds from Garcia's car. *Id*. Defense counsel stipulated to the evidence and the court convicted him. *Id*. Accordingly, the court sentenced him to two consecutive years in prison. *Id*. at ¶ 18. "[T]he court admonished Garcia of his rights and he answered appropriately all questions, including those concerning his decision to plead guilty, his right to a trial by jury, and whether he wished to waive the presentence investigation. Garcia replied with one-word answers of 'yes.'" *Id*.

## II. Procedural History

Garcia directly appealed his murder conviction, arguing the State failed to prove him guilty beyond a reasonable doubt because he was acting in self-defense. *Id*. at ¶ 22. Alternatively, Garcia contended that the conviction should be reduced

from first to second-degree because he unreasonably believed that the circumstances justified his use of deadly force in defense of another. *Id.* He did not seek to withdraw his guilty plea or appeal the weapon conviction. *Id.* In 2003, the appellate court affirmed Garcia's murder conviction. *Id.*

Garcia first tried to withdraw his guilty plea, citing his mental health, in 2004. *Id.* at ¶ 24. On September 15, Garcia petitioned pro se in a state postconviction trial court raising his fitness to stand trial, plead guilty, and be sentenced. *Id.* at ¶ 25. He argued that the combination of his medications made him "totally lethargic and unable to assist in his defense or make any rational decisions." *Id.* Garcia also alleged that his trial counsel ineffectively assisted him when he failed to inform the court of his "irrational behavior/demeanor and the fact that he was on psychotropic drugs," in addition to failing to object to the State's "inadequate" factual basis for his UUWF conviction because the police found no firearm on his person, he did not admit to possessing a firearm, and police found a firearm in his parked car. *Id.*

The trial court appointed counsel, and on August 26, 2009, Garcia filed a supplemental postconviction petition arguing that: (1) he was unfit to stand trial, plead guilty, or be sentenced because of his multiple suicide attempts and psychotropic medications; and (2) his trial counsel ineffectively assisted him when counsel failed to investigate Garcia's mental health, leading up to counsel misrepresenting Garcia's medications to the court. *Id.* at ¶ 27. The trial court dismissed the petition on all grounds except fitness, ordering a behavioral clinical examination to help address that issue. *Id.* at ¶ 28.

The court held a retrospective fitness hearing in 2012. *See People v. Garcia*, 2015 IL App (1st) 131180, ¶ 32. The defense called Dr. James Corcoran, a board-certified forensic psychiatrist and the medical director of Chicago Reed Mental Health Center, as well as Garcia's mother and sister. *Id.* at ¶¶ 27, 32. The State called Dr. Monica Argumedo, a psychiatrist with forensic clinical services that previously conducted Garcia's behavioral examination, and Garcia's two trial attorneys, Michael Clancy and David Peilet. *Id.* at ¶¶ 30, 32. Garcia's mother and sister testified that, over time, Garcia began acting distracted, almost like "his mind wasn't there." *Id.* at ¶ 35. They explained that Garcia often repeated himself and answered their questions with one word, assuming he even responded. *Id.*

Dr. Corcoran testified that, in his medical opinion, Garcia was unfit to stand trial and plead guilty because he was too sedated to assist defense counsel, even though he was able to understand the proceedings. *Id.* at ¶ 33. Dr. Corcoran felt that Garcia's mental condition worsened over time because of his multiple psychotropic medications, resulting in disorganized thinking. *Id.* Dr. Corcoran observed that the court did not ask Garcia complex questions calling for a narrative response, so Garcia's responses to the court at the time did not prove fitness. *Id.* More importantly, at least in Dr. Corcoran's view, was that Garcia did not testify. *Id.*

Dr. Corcoran did not retract his opinion even though he was aware that, a couple months after Garcia's sentencing in 2001, Garcia admitted to lying about trying to kill himself because he wanted to be moved into protective custody. *Id.* at ¶ 34. Dr. Corcoran cited the possible side effects of Garcia's medication, "including

sedation, passivity, tiredness, and sometimes inability to focus." *Id.* Dr. Corcoran opined that the combined effect of all the medications and Garcia's depression effectively precluded him from assisting or cooperating with his trial attorneys because "he would have difficulty forming thoughts in a coherent manner due to extensive sedation of the medications." *Id.* (quotation marks omitted).

Conversely, Dr. Argumedo testified that "Garcia understood the court process" and that "he was not experiencing any psychotic symptoms." *Id.* at ¶ 36. Dr. Argumedo believed that Garcia was just upset about his case, opining that "he understood what was going on because when this occurred, he understood the significance of then." *Id.* (quotation marks omitted). Dr. Argumedo stated that, during Garcia's trial:

> the times he reported suicidal thoughts were almost always in direct relation to something that was happening within his case, his case wasn't going well, he was looking at a lot of time, and so he was worried, and so he would get depressed to the point where he would want to kill himself, or he would attack another inmate, something would happen along those lines, and it seemed like it fit a pattern.

*Id.* (quotation marks omitted). Dr. Argumedo found "the fact that Garcia's depression correlated with how well his case seemed to be going indicated a good understanding of what was going on in the trial." *Id.* (quotation marks omitted).

Dr. Argumedo reviewed Garcia's medical records and found a few things to be significant. First, the fact that Garcia's stomach hurt him while taking a medication showed that Garcia had the "ability to be self-protective." *Id.* at ¶ 37. Second, because Garcia reported depression and abdominal discomfort, she would have expected him to also describe his mental confusion, lack of focus, and depleted emotions as well,

but Garcia did not. *Id.* Third, the incident where medical personnel restrained Garcia the night before his sentencing and plea hearing concerned Dr. Argumedo. *Id.* at ¶¶ 36, 38. But according to the records, Garcia started a fight when he hit another inmate with a food tray, and the hospital staff restrained him because he was "psychically fighting them" too. *Id.* at ¶ 38. Although medical personnel sedated him, Garcia remained "clear," "alert and oriented," and said, "I had to take care of my business." *Id.* (quotation marks omitted). Garcia slept through the night, and Dr. Argumedo stated that Garcia "didn't seem overly sedated." *Id.* (quotation marks omitted). Dr. Argumedo conceded, however, that "defense counsel was wrong when he informed the court Garcia was not taking any psychotropic medications and that an individual taking these types of medications could be fit one day and unfit the next." *People v. Garcia*, 2015 IL App (1st) 131180, ¶ 39.

Michael Clancy and David Peilet represented Garcia at trial. *Id.* at ¶ 40. Clancy met with Garcia over 20 times, leading him to believe that he was "absolutely able to assist in his defense." *Id.* Clancy testified that Garcia was "very involved in explaining the circumstances of the shooting" and "the facts the defense presented at trial came from Garcia's recollection." *Id.* Peilet testified that Garcia assisted in his own defense and that he and Clancy were able to strategize through their communication with Garcia. *Id.* at ¶ 41. Peilet never had a doubt about Garcia's fitness; in fact, the issue "never entered his mind" because Garcia was able to "intelligently discuss with him, and he was able to articulate certain specific facts that were needed

in preparation of the defense." *Id.* Both attorneys testified that Garcia acted "compliant and cooperative" in court, so they never questioned his fitness. *Id.* at ¶ 42.

The trial court denied Garcia's supplemental postconviction petition, finding Garcia fit at all relevant times, and crediting the State's witnesses over the defense witnesses. *Id.* at ¶ 44. Garcia appealed the denial of his petition for postconviction relief to the appellate court, arguing that the trial court erred in finding him fit and that his trial counsel ineffectively assisted him by stipulating to an insufficient and unproven weapons charge. *Id.* at ¶¶ 45, 62. The postconviction appellate court explained that the "well-settled test for fitness necessitates that a defendant have 'sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him [or her]." *Id.* at ¶ 51 (citing *People v. Stahl*, 2014 IL 115804, ¶ 24 (internal quotation marks omitted) (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); then quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)). In applying that test, the appellate court deferred to the trial court's credibility determinations and affirmed its holding that Garcia was able to understand the proceedings and participate in his own defense. *Id.* at ¶¶ 58, 60. As to the ineffective assistance claim, the court also affirmed the trial court, holding that knowing possession can be actual or constructive in Illinois, and:

> [t]he State established Garcia constructively possessed the firearm by showing he had 'knowledge of the presence of the weapon' (he informed the police of its existence and location) and that he 'exercised immediate and exclusive control over the area where the weapon was found' (it was found in his car on the floor of the passenger side).

*Id.* at ¶ 72. Based on that, "Garcia failed to make a substantial showing of both prongs of a meritorious ineffective assistance claim." *Id.* at ¶ 73 (citing *Strickland v. Washington*, 466 U.S. 668 (1983).

Garcia petitioned the Supreme Court of Illinois for leave to appeal, and on May 25, 2016, the court denied the petition. (Dkt. 17-12.) On July 27, Garcia filed a timely petition for a writ of habeas corpus in this Court. (Dkt. 1.)

## STANDARD OF REVIEW

Because the Appellate Court of Illinois was the last court to review Garcia's constitutional claims on the merits, this Court reviews its decision, governed and greatly limited by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Czech v. Melvin*, No. 17-1838, 2018 WL 4520073, at *2 (7th Cir. Sept. 21, 2018) (internal quotation and citation omitted). Under the Act, a federal court cannot grant state prisoner's habeas petition unless the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision is "contrary to" clearly established federal law if the "state court applies a rule different from the law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court] has done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citation omitted). A state court "unreasonably applies" clearly established federal law "if the state court identifies the correct governing legal principle" but

"unreasonably applies that principle to the facts of the petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (internal quotations omitted). Finally, a "state court decision rests on an unreasonable factual determination when the state court determined an underlying factual issue against the clear and convincing weight of the evidence." *Weaver v. Nicholson*, 892 F.3d 878, 882–83 (7th Cir. 2018) (internal citation and quotation omitted).

Unreasonable means objectively so, not just that the decision was wrong. *See Rhodes v. Dittmann*, No. 17-2223, 2018 WL 4290735, at *6 (7th Cir. Sept. 10, 2018) (internal citations and quotations omitted). In other words, a decision is reasonable "so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101, 131 (2011). These standards are "difficult to meet" and "highly deferential." *Perez-Gonzalez v. Lashbrook*, No. 18-1480, 2018 WL 4402341, at *3 (7th Cir. Sept. 17, 2018). Congress meant them to be.

**ANALYSIS**

Garcia raises claims under the Fourteenth and Sixth Amendments to the Constitution. First, the Fourteenth Amendment claim: Garcia argues that the state court denied him due process of law when it held that he was fit to stand trial, plead guilty, and be sentenced for his crimes. Second, the Sixth Amendment claims: he contends that his trial counsel did not effectively assist him by (a) stipulating to an insufficient factual basis underlying a weapon charge and by (b) failing to investigate his mental health, resulting in counsel misrepresenting Garcia's medication to the court.

It is not clear from the face of Garcia's petition which § 2254(d) clause he is bringing his claims under, whether it be the "contrary to" federal law clause, "unreasonable application" of federal law clause, or "unreasonable factual determination" clause. Regardless, federal courts do not require pro so petitioners to articulate their claims "with lawyerly precision." *McGhee v. Watson*, 900 F.3d 849, 853 (7th Cir. 2018). Construing Garcia's claims "liberally," *Ambrose v. Roeckeman*, 749 F.3d 615, 618 (7th. Cir. 2014), he does not take issue with the state court's factual findings, but he does contest its legal conclusions, so the Court will analyze the claims under both of the statute's legal clauses.

Even liberal construction, however, cannot save Garcia's failure to investigate claim from the statute because a state prisoner must exhaust available remedies in state court before petitioning a federal court for habeas relief. *See* 28 U.S.C. § 2254(b)(1). "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). One complete round can occur "either on direct review or in post-conviction proceedings." *McGhee v. Watson*, 900 F.3d 849, 854 (7th Cir. 2018) (quotation and citation omitted). "To exhaust state remedies in the Illinois courts, the prisoner must include his claims in a petition for leave to appeal to the Illinois Supreme Court." *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018), *cert. denied sub nom. Snow v. Nicholson*, 138 S. Ct. 2637 (2018) (citations omitted). If the petitioner fails to present a claim to the state courts, he procedurally defaults it, and a federal court cannot review it

absent "cause and prejudice" or a miscarriage of justice, meaning the conviction of a person who is actually innocent. *See id.*

Here, Garcia did not fairly present his second ineffective assistance claim to the Appellate Court or Supreme Court of Illinois because he did not give them a fair opportunity to consider it. Namely, he did not raise the failure to investigate argument when he appealed the trial court's denial of his postconviction petition. (Dkt. 17-6 at 26–30; Dkt. 17-12 at 28–32.) Counsel represented Garcia in that appeal, so his omission is not entitled to leniency. Therefore, Garcia defaulted that claim, which precludes this Court from reviewing its merit. Garcia did not default his other two claims, however, so this Court must consider their substance.

**I. Competency**

Garcia argues that he was mentally unfit to stand trial and plead guilty to his crimes. The State, in response, contends that the appellate court applied the correct standard and did so reasonably. The question on habeas review is whether the state court's decision is "contrary to" or an "unreasonable application of" Supreme Court precedent.

The Due Process Clause of the Fourteenth Amendment prohibits the states from trying and convicting mentally incompetent defendants. "The test for fitness or competency to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013) (quoting *Dusky v.*

*United States*, 362 U.S. 402, 402 (1960) (per curiam) (internal punctuation marks omitted)).

The Seventh Circuit is not alone in referring to this as "the standard laid down for competence to stand trial in *Dusky* . . ." or "[t]he *Dusky* (due process) standard of competence to stand trial . . ." *Brooks v. McCaughtry*, 380 F.3d 1009, 1012 (7th Cir. 2004). Indeed, that court has done so as recently as 2017. *See Tatum v. Foster*, 847 F.3d 459, 466 (7th Cir. 2017), *reh'g denied* (Mar. 1, 2017), *cert. denied*, 138 S. Ct. 355 (2017) (referring to "those competent enough to stand trial under *Dusky* . . ."). It is a "well established" tenet of constitutional law. *Woods v. McBride*, 430 F.3d 813, 817 (7th Cir. 2005) (citing *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (noting that the Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process'"). "A defendant must also be competent at the time he pleads guilty, and the standard governing competency to plead guilty is the same as that used to evaluate competency to stand trial." *Burt v. Uchtman*, 422 F.3d 557, 564 (7th Cir. 2005) (citing *Godinez v. Moran*, 509 U.S. 389, 398–99 (1993)).

"This standard comports with the standard under Illinois law." *Newman*, 726 F.3d at 928. Illinois codified it in 725 Ill. Comp. Stat. § 5/104-11(a) ("A defendant is presumed to be fit to stand trial . . . [and] is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense."). The Supreme Court has held that this standard "adequately protects the due-process rights of criminal defendants."

*Morgan v. Chandler*, 367 F. App'x 700, 702 (7th Cir. 2010) (citing *Pate v. Robinson*, 383 U.S. 375, 385 (1966)).

With all this in mind, the state court decision is not contrary to federal law. First, the appellate court cited *Dusky* and the operative state statute. *See People v. Garcia*, 2015 IL App (1st) 131180, ¶ 51. Second, the court did not decide Garcia's case differently than the Supreme Court has on materially indistinguishable facts. Nor is the decision an unreasonable application of *Dusky*. To be sure, the fact that Garcia stood trial and pled guilty under the influence of a handful of psychotropic medications is concerning. *Cf. Burt v. Uchtman*, 422 F.3d 557, 565–66 (7th Cir. 2005) (citing *Pitsonbarger v. Gramley*, 141 F.3d 728, 736 (7th Cir. 1998) ("the charge that a defendant was under the influence of psychotropic drugs at or near the time of trial is a serious one")). But "[t]he fact that a person suffers from a mental illness does not mean that he's incompetent to stand trial. He need only be able to follow the proceedings and provide the information that his lawyer needs in order to conduct an adequate defense, and to participate in certain critical decisions . . ." *Price v. Thurmer*, 637 F.3d 831, 833–34 (7th Cir. 2011) (citing *Drope v. Missouri*, 420 U.S. 162, 171–72 (1975); *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam); *Woods v. McBride*, 430 F.3d 813, 817 (7th Cir. 2005)).

Much like the appellate court observed, the drugs alone are not dispositive. *See People v. Garcia*, 2015 IL App (1st) 131180, ¶ 51. Notwithstanding that, the postconviction trial court ordered a retrospective fitness hearing, and rightly so. *Cf. Woods*, 430 F.3d at 820. Therefore, the state observed its statutorily prescribed

procedure aimed at testing a defendant's competency. Failing to do so would have been error. *Matheney v. Anderson*, 253 F.3d 1025, 1040 (7th Cir. 2001) (citing *Drope*, 420 U.S. at 172). But the trial court adhered to the process, and the appellate court's decision reasonably considered the expert opinions and other testimony regarding Garcia's fitness. *Cf. Newman v. Harrington*, 726 F.3d 921, 929 (7th Cir. 2013). It is not this Court's prerogative to disregard the credibility determinations of a state court on habeas review. *See Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (explaining that federal habeas courts owe a high level of deference to state court credibility determinations). Garcia's due process claim fails.

## II. Ineffective Assistance

Garcia also contends that his trial counsel ineffectively assisted him when they stipulated to the State's factual basis that supported his guilty plea for the weapon offense. The State, in reply, alleges that the appellate court properly held that, under Illinois law, Garcia constructively possessed the firearm in his vehicle. Under *Strickland v. Washington*, 466 U.S. 668 (1984), Garcia must show (1) that counsel's deficient performance (2) prejudiced his defense, robbing him of his Sixth Amendment rights to counsel and a fair trial. State courts have plenty of room to apply this general standard. *See Laux v. Zatecky*, 890 F.3d 666, 674 (7th Cir. 2018). Accordingly, this Court's review is "'doubly deferential.'" *Washington v. Boughton*, 884 F.3d 692, 701 (7th Cir. 2018) (quoting *Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016) (*Strickland* inquiry is "highly deferential" to counsel's plausible strategic choices, and federal habeas review under § 2254(d) is "highly deferential" to state court's decision)).

The appellate court applied the correct constitutional standard (*Strickland*) and decided Garcia's ineffective assistance claim on the merits, holding that the "parties properly stipulated to the only two essential elements," that he "failed to make a substantial showing his trial counsel should have objected to the factual basis," and that he "failed to make a substantial showing of both prongs of a meritorious ineffective assistance claim." *People v. Garcia*, 2015 IL App (1st) 131180, ¶ 73. That decision was not different from any of the Supreme Court's on materially indistinguishable facts.

Additionally, the appellate court did not unreasonably apply *Strickland* because the question of whether "knowing possession" of a firearm can be either "actual or constructive" (what counsel stipulated to in agreeing that Garcia informed the police that a firearm was on the passenger side floor of his car) is one of Illinois law, barring this Court's review because the state court interpreted a state statute. *People v. Garcia*, 2015 IL App (1st) 131180, ¶ 72. Thus, there is no clearly established federal law to question. *See Perez-Gonzalez v. Lashbrook*, No. 18-1480, 2018 WL 4402341, at *3 (7th Cir. Sept. 17, 2018) (citing *King v. Pfister*, 834 F.3d 808, 814 (7th Cir. 2016) ("It is well-established that on habeas review, a federal court cannot disagree with a state court's resolution of an issue of state law.")); *see also Washington*, 884 F.3d at 701 (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Ben–Yisrayl v. Buss*, 540 F.3d 542, 555 (7th Cir. 2008) ("[w]e are bound by a state court's interpretations of state law.")). As the state appellate court properly

observed, counsel was not ineffective for failing to raise a meritless argument. *See Boughton*, 884 F.3d at 701 (citing *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996)). Trial counsel's strategic position in stipulating to the facts was legally correct and therefore cannot constitute ineffective assistance. Therefore, Garcia's Sixth Amendment claim fails, too.

## CONCLUSION

Because Garcia procedurally defaulted one claim, raised another a federal court cannot scrutinize on habeas review, and the last failed to be contrary to or an unreasonable application of federal law, the Court denies his petition for a writ of habeas corpus.

The Court also declines to issue a certificate of appealability because Garcia failed to substantially show the denial of a constitutional right, or that reasonable jurists would debate, much less disagree, with this Court's resolution of Garcia's petition. *See* 28 U.S.C. § 2253(c)(2); *Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

_____
Virginia M. Kendall
United States District Judge

Date: October 29, 2018